**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| FRANK McPARTLIN, ) | |
| ) | |
| Plaintiff, ) | Case No. 17 C 00343 |
| ) | |
| v. ) | |
| ) | Judge Edmond E. Chang |
| COUNTY OF COOK, TONI ) | |
| PRECKWINKLE, individually and in her ) | |
| official capacity, and PETER N. SILVESTRI, ) | |
| individually and in his official capacity, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Frank McPartlin alleges that he was fired from his job as a Special Assistant in the Cook County Bureau of Administration in retaliation for political activity protected by the First Amendment. He filed a suit under 42 U.S.C. § 1983 and Illinois common law against three defendants: Cook County; Toni Preckwinkle, the President of the Cook County Board of Commissioners; and Peter Silvestri, a Commissioner on the Board.[1] (For convenience's sake, the Defendants collectively will be referred to as the County unless context dictates otherwise.) The County now moves to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). R. 13, Defs.' Mot. Dismiss.[2] The defense argues that McPartlin could be fired for political reasons because he was employed in a

---

[1]This Court has federal-question jurisdiction over McPartlin's federal claims under 28 U.S.C. § 1331 and supplemental jurisdiction over his state law claims under 28 U.S.C. § 1367.

[2]Citation to the docket is "R." followed by the entry number and, when necessary, the relevant page or paragraph number.

"*Shakman*-exempt" position. R. 14, Defs.' Br. at 5. In the alternative, they argue that Preckwinkle and Silvestri are entitled to qualified immunity. *Id.* at 8. The County also contends that McPartlin's state law claims are time-barred under the Illinois Governmental Tort Immunity Act. *Id.* at 11. For the reasons discussed below, the County's motion is granted as to McPartlin's First Amendment claims, and the Court relinquishes supplemental jurisdiction over his state law claims if and when the dismissal of the federal claims becomes final.

**I. Background**

For the purpose of this motion, the Court accepts as true all well-pleaded facts in the complaint. McPartlin has held several positions with Cook County over the years. R. 1, Compl. ¶¶ 9-13. In 1996, he started out as an Operating Engineer at the Department of Facilities Management. *Id.* ¶ 9. He left County employment in 1998, but was rehired in 2008 as a Coordinator in the Office of the Chief Administrative Officer. *Id.* ¶¶ 10-11. He again left County employment in 2010. *Id.* ¶ 12. In March 2011, McPartlin was again hired by the County, this time as a Special Assistant assigned to the Bureau of Administration. *Id.* ¶ 13. He was fired from that position on January 16, 2015. *Id.* ¶ 40.

Throughout his employment with the County, McPartlin was active in local politics. He placed signs in front of his home supporting political organizations and candidates, and later worked as a campaign manager on local campaigns. *Id.* ¶¶ 15, 19, 26. In early April 2011, he was appointed the director of the Elmwood Park Neighborhood Civic Organization (EPNCO). *Id.* ¶ 19. This is when McPartlin's run-ins with Silvestri began. *Id.* ¶ 20. Specifically, in May 2011, EPNCO, the Better

Government Association,[3] and Fox News started an investigation into possible corruption and misconduct amongst the Village of Elmwood Park's leadership; Silvestri was the Village President. Compl. ¶ 20. In June 2011, the BGA and Fox (but not EPNCO) published an article asserting that Elmwood Park employees performed work on Silvestri's house while being paid from the Village's coffers. *Id.* ¶ 21. A few months later, in October 2011, the BGA and Fox (again, not EPNCO) published an article alleging that Elmwood Park auxiliary police officers performed political campaign work for Silvestri while being paid by the Village (and as a condition of employment). *Id.* ¶ 22. In February 2012, the BGA and Fox alleged that non-residents with ties to Silvestri had voted in Village elections. *Id.* ¶ 23. According to McPartlin, on around July 20, 2012, Silvestri told McPartlin to resign as director of EPNCO. *Id.* ¶ 24.

Eventually, in December 2013, McPartlin announced that he was going to run for office himself, specifically for the Ninth District seat—Silvestri's seat—on the Cook County Board of Commissioners. *Id.* ¶¶ 29, 31. McPartlin alleges that Silvestri informed him that if he continued his run for Commissioner, McPartlin would lose his job with the County *Id.* ¶ 34. Running as the Democrat in the November 2014 race, McPartlin lost to Silvestri. *Id.* ¶¶ 31, 38. Two months after the election loss, on January 16, 2015, McPartlin was fired without any explanation. *Id.* ¶ 40.

---

[3]The Complaint refers only to the acronym "BGA," but the context makes it clear that the well-known watchdog group is the pertinent organization.

## II. Standard of Review

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of the Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). In order to survive such a challenge, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In evaluating the sufficiency of a complaint at this stage, factual allegations are to be assumed true. *Iqbal*, 556 U.S. at 678-79.

## III. Analysis

### A. Official Capacity Claims

As an initial matter, the County moves to dismiss any claims against Preckwinkle and Silvestri in their *official* capacities. Defs.' Br. at 4. They argue that those claims are redundant because official capacity claims are in reality claims against the municipality itself, and the municipality is already named in the suit. *Id.* McPartlin responds that the claims are not redundant, because the County is not named in all counts of the complaint. R. 26, Pl.'s Resp. Br. at 4.

In suits against public officials, *personal*-capacity suits and *official*-capacity suits are distinct. *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985) ("Proper application of this principle ... requires careful adherence to the distinction between

personal- and official-capacity action suits."). While "[p]ersonal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law," official-capacity suits "represent only another way of pleading an action against an entity of which an officer is an agent." *Id.* (internal quotation marks and citations omitted). Because suing someone in his or her "official" capacity is just the same as suing the government, "an official capacity suit is … to be treated as a suit against the entity." *Id.* at 166 (citing *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985)).

Here, Count One alleges that Cook County is liable for the retaliatory firing of McPartlin, and that simply duplicates the official-capacity claims in Counts Two and Three (both of which also allege retaliatory discharge). So the redundant official-capacity claims in Counts Two and Three are dismissed in favor of Count One. (As discussed below, the Court proposes to relinquish jurisdiction over the state-law claims, so there is no need to address the official-capacity claims in Counts Four, Five, and Six.)

### B. *Shakman*-Exempt Position

More substantively, the County argues that it was authorized to fire McPartlin for his political activities because his Special Assistant position was "*Shakman*-Exempt," meaning that the job was a policymaking role for which politics may lawfully be taken into account when deciding to fire McPartlin. Defs.' Br. at 5. To understand this argument, it would help to take a step back on a few legal principles. Generally speaking, the First Amendment prohibits governments

5

from firing an employee based on his or her political beliefs. *Branti v. Finkel*, 445 U.S. 507, 515 (1980). That said, "a government employee does not enjoy unlimited freedom of expression with respect to matters that relate to official responsibilities." *Vargas-Harrison v. Racine Unified Sch. Dist.*, 272 F.3d 964, 971 (7th Cir. 2001). In the typical First Amendment retaliatory discharge case, courts apply a balancing test that was first explained in *Pickering v. Board of Educ.*, 391 U.S. 563, 568 (1968), which balances the interests of the government, the individual, and the public.[4] And in a separate line of cases, the Supreme Court has allowed for political patronage in certain government hiring, acknowledging that confidentiality and policymaking concerns inherent in some positions make political considerations especially relevant to effective performance. *Branti*, 445 U.S. at 517. A position satisfies this *Branti* exception if "the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Id.* at 518.

The Seventh Circuit has interpreted these political patronage cases as a subset of the traditional First Amendment retaliation cases, explaining that "the *Pickering* analysis regularly will result in a determination that 'the government employer's need for political allegiance from its policymaking employee outweighs the employee's freedom of expression to such a degree that it obviates *Pickering* balancing.'" *Vargas-Harrison*, 272 F.3d at 971 (quoting *Bonds v. Milwaukee County,*

---

[4]First, "we ask … whether the public employee spoke on a matter of public concern" and then "whether 'the interests of the [employee], as a citizen, in commenting upon matters of public concern' outweigh 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Vargas-Harrison*, 272 F.3d at 971 (quoting *Pickering*, 391 U.S. at 568).

6

207 F.3d 969, 977 (7th Cir. 2000)). So when a policymaking employee's speech is at issue, the First Amendment does not guarantee bullet-proof protection.

This brings us back to the *Shakman* case. In that landmark case, Cook County was accused of taking into account politics in hiring (and in other employment decisions) for jobs that had no policymaking function at all. To settle the litigation, Cook County entered into a consent decree. *See Shakman v. Democratic Org. of Cook County,* 481 F.Supp. 1315, 1321 (N.D. Ill. 1979). The *Shakman* Consent Decree generally prohibits political-patronage hiring in Cook County. In keeping with the policymaking distinction, however, the Consent Decree also includes a list of positions that are exempt from the ban on patronage hiring. *See Wilson v. Cook Cty.*, 742 F.3d 775, 778 (7th Cir. 2014) ("[T]he position was a *Shakman* exempt position, meaning that it was excluded from the decrees prohibiting the county from making hiring decisions based on politics."). The County argues that it could fire McPartlin for political reasons (including the political activities mentioned in his complaint), because McPartlin's position is a policymaking position that is on the *Shakman*-exempt list. Defs.' Br. at 8, Exh. 3 at 12.

McPartlin does not dispute that the Special Assistant job is on the *Shakman*-exempt list. But he does dispute the County's interpretation of what it means to hold a *Shakman*-exempt job. Pl.'s Resp. Br. at 4. In his view, the exemption from *Shakman* is an exemption specifically from the Consent Decree, which was concerned only with discrimination on the basis of political-*party affiliation*. *Id.* at

7

5. So, the argument goes, the exemption does not provide for *"carte blanche"* retaliation against the legitimate exercise of First Amendment rights. *Id.* at 4. McPartlin argues that because he and Defendant Preckwinkle shared a party affiliation (namely, the Democratic Party), the exemption to *Shakman* is inapplicable in this case, at least as to Preckwinkle. *Id.* at 6.

But the exemption to *Shakman*—and, more importantly, the exemption to the First Amendment's bar on considering politics in employment decision-making—is *not* only concerned with preventing one political party from discriminating against another. The Seventh Circuit expressly said so in *Wilbur v. Mahan,* 3 F.3d 214, 218 (7th Cir. 1993). In that case, a deputy sheriff of an Illinois county criticized his then-boss, the Sheriff, for failing to delegate more authority to deputies. *Id.* at 215. The deputy decided to run against the Sheriff in the next election. *Id.* In response to that declaration of candidacy, the Sheriff put the deputy on unpaid leave. *Id.* A previous Seventh Circuit opinion had established that deputy sheriffs have so much discretion (more than just regular police officers) that they qualify as policymakers for purposes of First Amendment retaliation cases. *Id.* at 217 (citing *Upton v. Thompson*, 930 F.2d 1209, 1213-16 (7th Cir. 1991)). With that premise in place, *Wilbur* affirmed the dismissal of the deputy's retaliatory-firing claim—even though the deputy and the Sheriff were both Democrats. *Id.* at 218. The Seventh Circuit explained that the underlying rationale for the political-considerations exemption is that a public official cannot effectively implement his or her policies if there are opposing policymakers within it. *Id.* at 217. And based on

8

that rationale, it matters not that the officeholder and the employee are members of the same political party:

> That concern is activated when an employee who occupies such a job announces that he is going to run against his boss for the boss's office because the boss is not administering the office properly. The declaration of candidacy in these circumstances is a declaration of war. It makes the candidate a political enemy of his boss whether or not they are members of the same party—some of the bitterest political fights are *intraparty fights* … .

*Id.* at 218 (emphasis added). So an officeholder may consider a policymaking-employee's political views when making employment decisions, so long as the expression has some bearing on the employee's job, and despite the officeholder and employee sharing a political-party affiliation. *Id.* at 217-18.

*Wilbur*'s reasoning applies equally well to McPartlin's case. After McPartlin announced his candidacy against his boss, Silvestri was entitled to take into account McPartlin's political opposition to Silvestri. And Preckwinkle endorsed Silvestri in the race, Compl. ¶ 34, so she too could take into account McPartlin's political opposition—even though she and McPartlin belonged to the same political party. Whether it was practicing good government or not, the First Amendment did not bar either Preckwinkle or McPartlin to remove a policymaking employee like McPartlin based on his political opposition to them.

### C. Whistleblowing

Before wrapping up the discussion of the First Amendment claims, it is worth noting that McPartlin nods at another argument—but does not actually develop it. Specifically, the response brief mentions that McPartlin was fired (at least in part) for "whistleblowing activities that were unrelated to the functions of his

9

position… ." Pl.'s Resp. Br. at 6. But that is all McPartlin says about that argument. There is no further analysis of the issue, either factually (that is, what allegations form the premise of this argument) or legally (that is, what does the case law say about whistleblowing). *See* Pl.'s Resp. Br. at 4-6. The failure to develop this argument means he has forfeited it.

Even if McPartlin had developed the argument, it would fail. It is true that the First Amendment still protects a policymaker from retaliation for speech that reveals an abuse of office and where politics are not "implicated" in the firing. *Marshall v. Porter Cty. Plan Comm'n,* 32 F.3d 1215, 1221 (7th Cir. 1994). In *Marshall*, the Executive Secretary of a county's planning commission accused the County Building Inspector of, among other things, reaping excessive mileage reimbursements and failing to conduct inspections. *Id.* at 1218. The Seventh Circuit rejected the applicability of the policymaker exception because the criticisms simply had no relationship to partisan politics. In speaking out, the Executive Secretary

> was not aspiring towards [the Inspector's] position, nor was she attempting to oust one who belonged to a different party or party faction. The defendants do not argue that Marshall's discharge resulted from her political associations; nor do they argue that she supported the wrong candidate for office.

*Id.* at 1221. It is not hard to think of other situations where a policymaker's criticisms are more aptly characterized as whistleblowing than political opposition (for one, consider a policymaker accusing the officeholder of sexual harassment).

As noted earlier, however, McPartlin failed to develop this argument's legal premise from the case law (by pointing to *Marshall*, for example) and the factual premise from the complaint. The closest that he comes on the facts is mentioning, in

10

the qualified-immunity section of the response brief, that he "assist[ed] in a corruption investigation." Pl.'s Resp. Br. at 7. Presumably, McPartlin is referring to investigative efforts from 2011 and early 2012. As described earlier in this Opinion, McPartlin was the director of a neighborhood organization in Elmwood Park, known as EPNCO. Compl. ¶ 19. In May 2011, EPNCO, the Better Government Association, and Fox News "commenced an investigation" into Elmwood Park's leadership, including its Village President—Silvestri. *Id.* ¶ 20. The BGA and Fox News then published three articles revealing misconduct tied to Silvestri: in June 2011, an article asserting that Elmwood Park employees performed work on Silvestri's house while being paid from Village funds, *id.* ¶ 21; in October 2011, an article alleging that Elmwood Park auxiliary police officers performed political campaign work for Silvestri while being paid by the Village (and as a condition of employment); *id.* ¶ 22; and in February 2012, an article alleging that non-residents with ties to Silvestri had voted in Village elections, *id.* ¶ 23. In July 2012, Silvestri allegedly told McPartlin to resign as director of EPNCO, *id.* ¶ 24, and that was followed by a similar "request," indirectly communicated, by Preckwinkle that McPartlin step down, *id.* ¶ 25. (It is not alleged whether McPartlin complied.)

The problem with relying on these allegations (again, the response brief did not explicitly do so) from 2011 and 2012 for the whistleblower argument is that they do not plausibly state a claim for the retaliatory firing in January *2015*. The first problem is the sheer time gap between the articles and the firing: almost three years passed between the final article (in February 2012) and the firing (in January

2015). Second, the complaint does not actually allege concrete *facts* about EPNCO's role in the investigation, let alone McPartlin's role in it. The complaint asserts that EPNCO, BGA, and Fox News started the investigation, Compl. ¶ 20, but then conspicuously says nothing about EPNCO or McPartlin's role in the investigation. The complaint goes on to say that BGA and Fox News published the three articles, *Id.* ¶¶ 21-23, but again says nothing about EPNCO or McPartlin's role in the publication. On top of the time and factual gaps between the investigation and the firing, there is the glaring intervening event that McPartlin ran against Silvestri in November 2014, a few months before the January 2015 firing. On this complaint, no plausible claim is alleged connecting the purported whistleblowing to the firing. All in all, the complaint fails to adequately state a claim for relief under the First Amendment, so the § 1983 claims must be dismissed.

### D. State Law Claims

McPartlin also brings Illinois common law claims for intentional interference with economic expectancy. Compl. ¶¶ 61-66, 67-72. In response, the County argues that these claims are time-barred under the Illinois Tort Immunity Act. 745 ILCS 10/8-101(a). Defs.' Br. at 12. The Act sets a one-year statute of limitations for most tort suits brought against government employees or a municipality: "no civil action … may be commenced in any court against a local entity or any of its employees for any injury unless it is commenced within one year from the date that the injury was received … ." 745 ILCS 10/8-101(a). Although McPartlin argues that his state law claims ought to be exempt from the limitations period, the statutory text clearly

12

applies to all civil actions. Having said that, McPartlin's claim for equitable relief, that is, reinstatement to his job, is not covered by the Act. Another section of the Act, Section 2-101, generally states that "[n]othing in this Act affects the right to obtain relief *other than damages* against a local public entity or public employee." 745 ILCS 10/2-101 (emphasis added). So McPartlin's claim for reinstatement would not be barred by the one-year limitations period.

But there is no need to definitively resolve the limitations argument, because with the federal claims dismissed from the case, the Court relinquishes supplemental jurisdiction over the state law claims. When all federal claims in a lawsuit have been dismissed, there is a presumption that federal courts should relinquish jurisdiction over the remaining state law claims. *See RWJ Mgmt. Co. v. BP Prod. N. Am.,* 672 F.3d 476, 479 (7th Cir. 2012). Although this "presumption is rebuttable … 'it should not be lightly abandoned.'" *Id. (*quoting *Khan v. State Oil Co.,* 93 F.3d 1358, 1366 (7th Cir. 1996)). Indeed, this presumption is statutorily expressed in 28 U.S.C. § 1367(c)(3), which provides for the discretionary relinquishment of jurisdiction over state claims when the claims providing original jurisdiction (here, federal question jurisdiction) have been dismissed. The Seventh Circuit has identified three circumstances that might warrant overcoming the presumption, but none apply here. They are:

> (1) the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided.

13

*Sharp Elecs. Corp. v. Metro Life Ins. Co.,* 578 F.3d 505, 514-15 (7th Cir. 2009) (internal quotation marks and citations omitted). Here, there is no good reason to hang onto the state law claims: there will be no statute of limitations bar because of Illinois's savings statute, 735 ILCS 5/13-217; substantial resources have not been devoted to the state law claims; and it is not absolutely clear how Illinois common law applies to McPartlin's allegations. The presumption has not been overcome, so the Court will relinquish supplemental jurisdiction over the state law claims if the dismissal of the federal claims becomes final.

## IV. Conclusion

For the reasons discussed, the County's motion to dismiss is granted on the federal law claims (Counts One through Three) and, if the dismissal becomes final, then supplemental jurisdiction will be relinquished as to the state law claims (Counts Four through Six). If McPartlin thinks he can fix the deficiencies in the First Amendment claims, then he may file an amended complaint by March 1, 2018. *See Bausch v. Stryker Corp.,* 630 F.3d 546, 562 (7th Cir. 2010) (generally speaking, a "plaintiff is entitled to amend the complaint once as a matter of right"). As discussed in the Opinion, in light of the legal and factual hurdles, the Court is skeptical that McPartlin will be able to cure the problems in an amended complaint,

but he is entitled to try. The status hearing of February 26, 2018, is reset to March 6, 2018, at 1:15 p.m.

ENTERED:

      s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: February 10, 2018